UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JARED J. CAMERON #276559,                           Case No. 2:19-cv-00071

　　　　　　　　Plaintiff,                              Hon. Gordon J. Quist
                                                    U.S. District Judge

　　　v.

SHERRI NEWCOMB,

　　　　　　　　Defendant.
_____/

**<u>REPORT AND RECOMMENDATION</u>**

### I. Introduction

This is a civil rights action brought by state prisoner Jared J. Cameron pursuant to 42 U.S.C. § 1983.  The sole remaining Defendant is Corrections Officer (CO) Newcomb.  Cameron alleges that Newcomb retaliated against him and conspired to do so, in violation of the First Amendment, by firing him from his kitchen job on July 4, 2016, because he filed grievances against other corrections Officers in January of that same year.  In addition, Cameron alleges that Newcomb violated his right to freely exercise his religion, also in violation of the First Amendment, by prohibiting him from praying during work hours.  Finally, Cameron alleges that Newcomb intentionally inflicted emotional distress on him, in violation of Michigan law.

Newcomb has filed a motion for summary judgment.  (ECF Nos. 28, 30.)  Cameron has responded.  (ECF No. 30.)  Newcomb then replied.  (ECF No. 33.)  The undersigned has reviewed the pleadings and associated documents and respectfully

recommends that the Court grant Defendant Newcomb's motion for summary judgment and dismiss this case.

### III.  Summary of Plaintiff's Allegations

Plaintiff's allegations are summarized in the table below.

| Number | Claim | Defendant | Date or Date Range of Incident(s) |
|--------|-------|-----------|-----------------------------------|
| 1 | Newcomb retaliated against Plaintiff by providing negative work evaluation (CSJ-363 form) with recommendation for termination after refusing two direct orders to pass out napkins, allegedly due to prior grievances filed by Plaintiff.  (ECF No. 24, PageID.115-17, 118.) | Newcomb | July 4, 2016 |
| 2 | Newcomb conspired with food director Gugin to terminate Plaintiff's job assignment.  (*Id.*, PageID.115-17, 119.) | Newcomb | July 4, 2016 |
| 3 | Newcomb refused to allow Plaintiff to pray during work assignment. (*Id.*, PageID.117-18, 119.) | Newcomb | December 22, 2018 |
| 4 | Newcomb intentionally inflicted emotional distress on Plaintiff. (*Id.*, PageID.119.) | Newcomb | Unclear |

### III.  Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient

disagreement to require submission to a jury[1] or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### IV. Failure to Exhaust Administrative Remedies

#### A.  Legal Standards

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove.  *Jones v. Bock*, 549 U.S. 199, 212-16 (2007).  "[W]here the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).  Accordingly, summary judgment in favor of the party with the burden of persuasion "is

---

[1]    Disputed issues of fact regarding exhaustion under the Prison Litigation Reform Act (PLRA) may be decided in a bench trial and need not be submitted to a jury. *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015).

inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones*, 549 U.S. at 218-19; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218-19. In rare circumstances, the grievance process will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. ___, 136 S.Ct. 1850, 1859-60 (2016).

"Beyond doubt, Congress enacted [Section] 1997e(a) to reduce the quantity and improve the quality of prisoner suits." *Porter*, 534 U.S. at 524.  In the Court's view, this objective was achieved in three ways.  First, the exhaustion requirement "afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Id.* at 525.  Second, "the internal review might 'filter out some frivolous claims.'" *Id.* (quoting *Booth*, 532 U.S. at 737*).*  And third, "adjudication could be facilitated by an administrative record that clarifies the contours of the controversy." *Id.* When institutions are provided adequate notice as required under the PLRA, the opportunity to address the claims internally furthers the additional goals of limiting judicial interference with prison administration. *Baker v. Vanderark*, 1:07-cv-004, 2007 WL 3244075, *5 (W.D. Mich., Nov. 1, 2007).

Michigan Dept. of Corrections (MDOC) Policy Directive 03.02.130 (effective on July 9, 2007, superseded on March 18, 2019), sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control.  *Id.* at ¶ P.  If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution.  *Id.* at ¶¶ P, V.  The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ V.   The Policy Directive also provides the following directions for completing

grievance forms: "The issues should be stated briefly but concisely.   Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).   Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R (emphasis in original).

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due.  MDOC Policy Directive 03.02.130 at ¶¶ T, BB.  The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for medical care grievances.  *Id.* at ¶ DD.

If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form.  *Id.* at ¶¶ T, FF.  The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due.  *Id.* at ¶¶ T, FF.  The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director.  *Id.* at ¶ GG.

"The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved." *Id.* at ¶ S.

In addition, the grievance policy provides that, where the grievance alleges conduct that falls under the jurisdiction of the Internal Affairs Division pursuant to

Policy Directive 01.01.140, the prisoner may file his Step I grievance directly with the inspector of the institution in which the prisoner is housed, instead of with the grievance coordinator, as set forth in ¶ W of Policy Directive 03.02.130.  *Id.* at ¶ R. In such instances, the grievance must be filed within the time limits prescribed for filing grievances at Step I.  *Id.*  Regardless of whether the grievance is filed with the grievance coordinator or the inspector, the grievance will be referred to the Internal Affairs Division for review and will be investigated in accordance with MDOC Policy Directive 01.01.140.  The prisoner will be promptly notified that an extension of time is needed to investigate the grievance.  *Id.*

Where the grievance procedures are not available because the issue presented is non-grievable, exhaustion of prison grievance procedures is not required.  It is well-established that a prisoner "cannot be required to exhaust administrative remedies regarding non-grievable issues." *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004); *Mays v. Kentucky Dept. of Corrections*, 2018 WL 4603153, at *3 (W.D. Ky. Sept. 25, 2018) ("It is beyond debate that an inmate cannot be required to exhaust administrative remedies regarding non-grievable issues."); *Reeves v. Hobbs*, 2013 WL 5462147 (W.D. Ark. Sept. 3, 2013) ("Defendants cannot treat a complaint as non-grievable, and therefore not subject to the grievance procedure, and then turn around and maintain the claim fails because [the plaintiff] failed to follow the grievance procedure. As the well known proverb states, they cannot have their cake and eat it too.").

When prison officials waive enforcement of these procedural rules and instead consider a non-exhausted claim on its merits, a prisoner's failure to comply with those rules will not bar that prisoner's subsequent federal lawsuit.    *Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010).  The Sixth Circuit has explained:

> [A] prisoner ordinarily does not comply with MDOCPD 130—and therefore does not exhaust his administrative remedies under the PLRA—when he does not specify the names of each person from whom he seeks relief.  *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 324-25 (6th Cir. 2010) ("Requiring inmates to exhaust prison remedies in the manner the State provides—by, say, identifying *all* relevant defendants—not only furthers [the PLRA's] objectives, but it also prevents inmates from undermining these goals by intentionally defaulting their claims at each step of the grievance process, prompting unnecessary and wasteful federal litigation process.").  An exception to this rule is that prison officials waive any procedural irregularities in a grievance when they nonetheless address the grievance on the merits. *See id*. at 325.   We have also explained that the purpose of the PLRA's exhaustion requirement "is to allow prison officials 'a fair opportunity' to address grievances on the merits to correct prison errors that can and should be corrected to create an administrative record for those disputes that eventually end up in court."  *Id*. at 324.

*Mattox v. Edelman*, 851 F.3d 583, 590-91 (6th Cir. 2017).[2]

## B.  Analysis of Newcomb's Exhaustion Argument

In her motion for summary judgment, Newcomb argues that Cameron failed to exhaust his administrative remedies regarding his retaliation and conspiracy claims that allegedly occurred on July 4, 2016, which are Claims 1 and 2 in the summary chart above.  Newcomb notes that Cameron filed **grievance URF-1607-**

---

[2]    In *Mattox*, the Sixth Circuit held that a prisoner may only exhaust a claim "where he notifies the relevant prison . . . staff" regarding the specific factual claim "giving the prison staff a fair chance to remedy a prisoner's complaints."  *Id*. at 596. For example, grieving a doctor about his failure to give cardiac catheterization failed to grieve the claim that the doctor erred by not prescribing Ranexa.

**2668-02B** at Step I and Step II (ECF No. 29-3, PageID.172-178), but failed to appeal this grievance to Step III.  (*Id.*, PageID.170.)  To confirm Cameron's failure to exhaust his grievance through Step III, Newcomb provided **(1)** the affidavit of URF Grievance Coordinator Michael McLean, who attested that Cameron pursued **grievance URF-1607-2668-02B** through Step II, but failed to file a Step III appeal for that grievance (Id., PageID.168-170), **(2)** the affidavit of MDOC Analyst Nelson, who attested that all grievances appealed to Step III are listed in a MDOC Prisoner Step III Grievance Report (ECF No. 29-4, PageID.180), and **(3)** a copy of Cameron's Step III Grievance Report, which does not list a Step III appeal associated with **grievance URF-1607-2668-02B** (*Id.*, PageID.181).  This report does list two other grievances that Cameron appealed to Step III.

In response, Cameron says that he did exhaust his claims of retaliation through Step III but asserts that copies of the receipts were lost.  (ECF No. 30, PageID.293.)

In the opinion of the undersigned, the record before the Court indicates that Cameron failed to exhaust his administrative remedies with respect to his retaliation and conspiracy claims (Claims 1 and 2 in the summary chart above) for three reasons.  First, MDOC Analyst Nelson explained that MDOC keeps a record of grievances pursued through Step III.  Her statement indicates that this report (ECF No. 29-4, PageID.181) qualifies as a record of a regularly conducted activity, which is an exception to the hearsay rule.  Fed. R. Evid. 803(6).  Furthermore, this report indicates the absence of Step III appeal associated with **grievance URF-1607-2668-**

**02B**, as allowed pursuant to Fed. R. Evid. 803(7).  Thus, Newcomb has provided admissible evidence showing the absence of a Step III appeal filed by Cameron.

Second, Cameron has done nothing to cause the Court to question the reliability of this report.  (*Id*.)

Thus, the undersigned agrees that Newcomb has shown that Cameron did not pursue his grievance through Step III.

But, more importantly, even if Cameron has pursued this grievance through Step III, he would not have exhausted his administrative remedies because he failed to raise the issue of retaliation.  Cameron's complaint in **grievance URF-1607-2668-02B** was that Newcomb and Gugin did not follow the job termination procedure correctly, not that they terminated him due to retaliation.  Thus, Cameron did not raise the retaliation issue in his Step I and II grievances.  Cameron provided a type-written statement that outlined the basis for his Step I grievance.  It is shown below.

This grievance is wrote on C/O Newcomb  and Trinity Food Director G
Gugin  for violation of PD 05.01.100 With prior approval of the Warden or
designee  a prisoner who is charged with any misconduct may be temporarily
suspended (i e   laid in ) from his assignment pending the misconduct
hearing

If a prisoner earns a below average score on the Prisoner Program and Work
Assignment Evaluation for his work assignment  his performance shall be
closely monitored for the next 30 days  If after 30 days calendar days the
prisoner does not raise that score to a satisfactory/average score  the
prisoner shall be referred for reclassification

7/7/2016  I received in the mail a copy of Prisoner Program And Work
Assignment Evaluation 363 Evaluators C/O Newcomb  & G  Gugin   Stating
Working on the line  prisoner Cameron was told by Trinity Kelly to hand out
2 napkins to each prisoner  Cameron continued allowing prisoners to take
their own napkins  I repeated the order to Crmeron  he replied   It s not my
job  I told him to pass out the napkins as told  He repeated   It's not my
job  I told him to step away from the line, we'd fill it with someone else
he sais  He  Its not my job  I m not passing out napkins

See 7/4/16, 363  I had no exceptions  no statements were circled that
describes any negative work assignment performance  I wasn't put on 30 days
conditional,  I should of been given 39 points  I  didn't receive any
misconducts  so I shouldn't of been laid in pursuant to PD 05.01.100 cited
above

Pursuant to PD 05.01.100 if the prisoner is not found guilty at the
Initial hearing  he SHALL be paid for any time he was removed from the
assignment  Based on the enclosed I m requesting my assignment back, and back
pay, and no retaliation

(ECF No. 29-3, PageID.173.)

At the end of the last paragraph, Cameron wrote "and no retaliation."  Given

the context of the statement, he was stating that he should not be retaliated against

for filing this grievance.  Cameron did not assert that he was terminated from his job

in retaliation for earlier grievances he filed.

In his Step II appeal, Cameron wrote the following:

```
I am appealing this grievance at Step I due to the following reason(s)

    In the Step I response the Summary of Complaint

        The respondent misinterpreted what the issue of my grievance was   My
issue is that MDOC policy 05 01 100 CLEARLY states (as interpreted by the
Office of Legislative Corrections Ombudsman   January 11th 2016) that a
prisoner may only be terminated for 1 of 2 reasons  (1) They are found guilty
of a Class I/Class II misconduct; which I DID NOT  or (2) They receive
PROGRESSIVELY NEGATIVE work evaluations (which I have NOT)

        Yet  upon review of my Step I grievance  by TCF Staff member Pietrangelo,
this policy was IGNORED and my grievance was denied

        In the Investigation Information section.

    The incident was incorrectly accounted   Video footage will CLEARLY show that
upon being instructed to pass out the napkins that this prisoner in fact DID
follow instruction  Officer Newcomb misinterpreted an exchange between this
prisoner and another which resulted in her intercession   If thoroughly
investigated by review of camera footage it will be seen that although a
discussion was had between the officer and myself, I DID do as told

        In the Applicable Policy, Procedure  Etc  section.

    Policy 05 01 100 was not cited   The direct violation of this policy as
interpreted by the Ombudsman is what I'm grieving

        MDOC policy directive supersedes all procedures and in this incident and
in the actions to follow by various staff members policy directive 05 01 100
was clearly violated
```

(*Id.*, PageID.177.)  Again, Cameron did not raise the retaliation issue.

Cameron simply did not raise the issue of retaliation in his Step I grievance or Step II appeal.  Thus, he did not exhaust his administrative remedies with respect to the retaliation and conspiracy claims he states in his amended complaint.  (*See* ECF No. 24, PageID.116.)  The undersigned respectfully recommends that these claims be dismissed for failure to exhaust.

## V.  Retaliation

Newcomb argues, in the alternative, that even if Cameron had exhausted his July 4, 2016 retaliation and conspiracy claims, he cannot establish his claims because Newcomb would have taken the same action despite Cameron's prior unrelated grievance filings.   Retaliation based upon a prisoner's exercise of his or her

constitutional rights violates the Constitution. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id.*  Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

*Thaddeus-X*, 175 F.3d at 399 (internal citation omitted).

It is undisputed that Cameron refused two direct orders from Defendant Newcomb to pass out napkins.  Cameron refused to pass out napkins because he thought it was not his job.  As a result, Defendant Newcomb issued a CSJ-353 Prisoner Program and Work Assignment Evaluation form with the recommendation to terminate Cameron's employment.  She explained on the form:

COMMENTS AND RECOMMENDATIONS:
Working on the line, prisoner Cameron was told by Trinity Kelly to hand out 2 napkins to each prisoner.  Cameron continued allowing prisoners to take their own napkins.  I repeated the order to Cameron.  He replied: "It's not my job."  I told him to pass out the napkins as told.  He repeated: "It's not my job."  I told him to step away from the line, we'd fill it with someone else.  He said: "It's not my job, I'm not passing out napkins."

(ECF No. 29-3, PageID.175.)

13

Cameron does not contest that he refused to pass out the napkins after he was ordered to do so.   Instead, he argues that Newcomb should have issued him a misconduct ticket for disobeying a direct order and this would have allowed him to be hired back to job.  (ECF No. 30, PageID.293.)  Cameron now alleges that Newcomb retaliated against him by choosing to issue a CSJ-363 work evaluation form instead of a misconduct ticket.  (*Id*., PageID.292.)  Newcomb explains that during this time, while Trinity provided food service at the prisons, MDOC officers issued CSJ-363 work evaluation forms because Trinity employees were not state employees trained by the MDOC.  (ECF No. 29-2, PageID.162.)  It was Defendant Newcomb's practice to fill out CSJ-363 forms whenever she observed prisoners disobeying a direct order and to recommend termination.  (*Id*.)

The undersigned concludes that no genuine issue of material fact exists as to Cameron's retaliation and conspiracy claims.   Cameron argues, without any evidentiary support, that Defendant Newcomb should have issued him a misconduct ticket instead of filling out the CSJ-363 form.  Cameron does not dispute that he disobeyed a direct order while he was on a job assignment.  He also has not shown that other prisoners who engaged in the same conduct received a less severe sanction. In the opinion of the undersigned, Newcomb has shown "that [s]he would have taken the same action in the absence of the protected activity", as required under *Thaddeus-X*, 175 F.3d at 399, thus warranting a grant of summary judgment.   Newcomb's explanation provides a second reason to grant summary judgment as to Cameron's retaliation and conspiracy claims.

## VI.  Free Exercise

Cameron argues that Defendant Newcomb violated his First Amendment rights when she told him he could not pray during his work assignment.  Newcomb attests that Cameron did speak with her regarding his request to pray during his work assignment.  (ECF No. 29-2, PageID.163.)  Newcomb also attests that contacted the Chaplain for direction regarding the rule prohibiting prisoner prayer during work assignments.  (*Id*.)  The Chaplain informed her that "[p]risoners are not allowed to pray during work, yard or class.  They are restricted to private prayer in their room, no public areas of the unit; and to public prayer at designated rooms, chapel, pavilion, etc., for their service."  (*Id*., PageID.166.)  Newcomb also attests that she applied Policy Directive (PD) 05.03.150, which outlines some accommodations regarding work assignments for prisoners who wish to practice their religious beliefs as well as some limitations in allowable religious practices inside the prison.  (*Id*., PageID.163.)  Newcomb explained that she provided this PD number to Cameron so he could look it up for himself.  (*Id*.)

While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion.  *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted).  To establish a violation of his First Amendment rights, Cameron must show that: (1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) Defendant's behavior infringes upon this practice or belief.  *Kent v. Johnson*, 821

F.2d 1220, 1224-25 (6th Cir. 1987); *see also, Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same); *Bakr v. Johnson*, No. 95-2348,1997 WL 428903, at *2 (6th Cir. July 30, 1997) (noting that "sincerely held religious beliefs require accommodation by prison officials").

Prison officials may impinge on a prisoner's constitutional right to exercise First Amendment religious beliefs if their actions are "reasonably related to legitimate penological interests." *Flagner*, 241 F.3d at 483 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987). To determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess the official's actions by reference to the following factors:

1.    does there exist a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

2.    are there alternative means of exercising the right that remain open to prison inmates;

3.    the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and

4.    whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-91).

Failure to satisfy the first factor renders the regulation or action infirm, without regard to the remaining three factors. *Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-90) ("a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational").

If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the policy or action at issue is reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484 (citations omitted). It should further be noted that the *Turner* standard is "not a 'least restrictive alternative' test" requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint" *Id.* Instead, the issue is simply whether the policy or action at issue is reasonably related to a legitimate penological interest. *Id.* "However, 'if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.'" *Id.* at 484 (quoting *Turner*, 482 U.S. at 91.)

This Court recently resolved a similar issue in *Board v. Weston*, 2:19-cv-151 (W.D. Mich. August 2, 2019) (ECF No. 29-7, PageID.220-236.) In denying a similar claim the Court explained that

> Logic dictates that the Supreme Court's determination in *O'Lone*—that the Free Exercise Clause does not require prisons to allow Muslim

17

prisoners to leave work to attend Jumu'ah one time each week— necessarily precludes a determination that prisons must either allow demonstrative prayer on work sites or allow a prisoner to leave work and return to his cell multiple times each day, in order to engage in demonstrative prayer. For this reason alone, the Court concludes that Plaintiff fails to state a free exercise claim.

(2:19-cv-151, ECF No. 5, PageID.52.)

The Court further gave examples of several similar cases applying the *O'Lone* factors to claims by prisoners that they have the right to pray in common areas, public areas, or during their assigned work hours.  (*See* 2:19-cv-151, ECF No. 5, PageID.52-54 (citing *Williams v. Sec'y Penn. Dep't of Corr.*, 450 F. App'x 191 (3d Cir. 2011) (proscribing demonstrative prayer in a corner of the kitchen did not violate the Free Exercise Clause); *Jackson v. Maemisch*, 726 F. Supp. 2d 991, 1000-03 (W.D. Wis. 2010) (refusing to allow the plaintiff to perform his demonstrative daily prayer during work hours in the coatroom of the kitchen did not violate the First Amendment); *Jihad v. Fabian*, 680 F. Supp. 2d 1021 (D. Minn. 2010) and *Miller v. Bouchard*, No. 9:10-CV-983, 2013 WL 1294417, at *9 (N.D.N.Y. Mar. 4, 2013) (religious rights of Muslim prisoners were not violated by refusing to allow them to leave their cell five times a day for prayer); *Totten v. Caldwell*, No. 11-12485, 2012 WL 3965045 (E.D. Mich. July 31, 2012) and *Dowdy-El v. Caruso*, No. 06-11765, 2012 WL 8170409 (E.D. Mich. July 24, 2012) (refusal to allow a prisoner to leave work and school assignments to attend the Al-Jumu'ah prayer service had a rational connection with a legitimate governmental interest); *Withrow v. Bartlett*, 15 F. Supp. 2d 292 (W.D.N.Y. July 16, 1998) (concluding that a prison's ban on demonstrative prayer in the recreational yard did not violate the Free Exercise Clause).)

18

Similarly, the MDOC policy prohibiting prisoners from engaging in public prayer in common areas while they are on work assignment furthers the legitimate penological objectives of maintaining safety, good order, and security of the prison, prisoners, and staff.   The MDOC has set forth alternatives to accommodate those prisoners who wish to be released from work to practice their religious beliefs. (ECF No. 29-6, PageID.210, Policy Directive 05.03.150 AA.)  In addition, a prisoner may pray silently (as opposed to in a demonstrative manner) or while he is in attendance at group services, or he could wait until he returns to his cell.  As set forth by the Court's decision in *Board* and the case law cited in *Board*, it is the opinion of the undersigned, that Defendant Newcomb did not violated Cameron's First Amendment rights by enforcing the prison rule that disallows prayer during the time that a prisoner is at his job assignment.   Accordingly, the undersigned respectfully recommends that the Court grant summary judgment for Newcomb on Cameron's First Amendment Free Exercise claim.

### VII.  State Law Claim

 Cameron asserts that Defendant Newcomb's actions rose to intentional infliction of emotional distress under Michigan law.  Claims under § 1983 can only be brought for "deprivation of rights secured by the constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982).  Cameron, however, seeks to invoke this Court's supplemental jurisdiction over state-law claims.  In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of

litigation and balance those interests against needlessly deciding state law issues."
*Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  Ordinarily,
where a district court has exercised jurisdiction over a state-law claim solely by virtue
of supplemental jurisdiction and the federal claims are dismissed prior to trial, the
court will dismiss the remaining state-law claims.  *Id.*  Dismissal, however, remains
"purely discretionary."  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009)
(citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843,
850 (6th Cir. 2012).  It is respectfully recommended that the Court decline to exercise
supplemental jurisdiction over the state law claims.

## VIII.  Recommendation

The undersigned respectfully recommends that this Court grant Defendant
Newcomb's motion for summary judgment and dismiss Cameron's retaliation and
conspiracy claims that arose on July 4, 2016, without prejudice due to his failure to
exhaust his administrative remedies, and dismiss Cameron's First Amendment Free
Exercise claim with prejudice.  In addition, the undersigned recommends the Court
dismiss Cameron's state law claim

If the Court accepts this recommendation this case will be dismissed.


Dated:   November 16, 2020                     /s/ *Maarten Vermaat*
                                               MAARTEN VERMAAT
                                               U. S. MAGISTRATE JUDGE



## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).